NOT DESIGNATED FOR PUBLICATION

No. 116,281

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

GUSTAVO RAMOS-BELETA,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.


MEMORANDUM OPINION

Appeal from Finney District Court; RICKLIN R. PIERCE, judge. Opinion filed August 11, 2017. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Brian R. Sherwood*, assistant county attorney, *Susan Lynn Hillier Richmeier*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before BRUNS, P.J., MCANANY, J., and STEVEN R. EBBERTS, District Judge, assigned.


PER CURIAM: Gustavo Ramos-Beleta appeals from the district court's summary dismissal of his K.S.A. 60-1507 motion. In his motion, Ramos-Beleta alleged that his attorney was ineffective. Specifically, he contends that his attorney somehow misled him into accepting a plea agreement. Based on our review of the motion and record on appeal, we conclude that Ramos-Beleta has failed to show that that he presented a substantial issue requiring an evidentiary hearing. Rather, we find that the motion, files, and records conclusively establish that Ramos-Beleta is not entitled to relief. Thus, we affirm the district court's summary dismissal of Ramos-Beleta's K.S.A. 60-1507 motion.

1

FACTS

The underlying facts of this case were set forth in *State v. Ramos-Beleta*, No. 105,941, 2012 WL 5519119, at \*1-2 (Kan. App. 2012) (unpublished opinion), *rev. denied* 296 Kan. 1134 (2013):

Ramos-Beleta and Maria Castillo were married for 16 years and have four children. They divorced in 2006, at which time Ramos-Beleta was convicted of criminal threat for threatening to kill Maria. When Ramos-Beleta was released from prison in 2009, he returned to Garden City, where Maria and the children were still living. One of the conditions of Ramos-Beleta's parole supervision was that he have no contact with Maria or any member of her family.

By 2009, Maria and the children had moved out of the home they shared with Ramos-Beleta and into an apartment located on the edge of town. Maria often saw Ramos-Beleta drive by her apartment. Maria worked as a processor at Tyson, and Ramos-Beleta worked for NFC, a Tyson subcontractor. Ramos-Beleta frequently parked near her vehicle at work, even after Maria would move her car away from his. Although there was no reason for any contact between the Tyson processors and the NFC workers, Maria began seeing Ramos-Beleta at work sometime after Christmas 2009. Ramos-Beleta would approach a table where Maria was working and stare at her. Once, he told Maria that "things weren't going to stay this way." Ramos-Beleta visited his son, G.R., at work multiple times and inquired about Maria, asking why she was dressing up for work and whether she had a boyfriend. In January 2010, Ramos-Beleta told G.R. to tell Maria that "if she wasn't careful he'd kill her."

In the early morning hours of January 25, 2010, Maria was sleeping when Ramos-Beleta opened her bedroom door and turned on the light. Maria had locked the apartment the previous night and had never given Ramos-Beleta permission to come inside. Ramos-Beleta told Maria that he had been looking for her and that "it was time to finish what he had started." Before Maria could scream or tell him to leave, Ramos-Beleta was on top of her and had stabbed her right leg with a knife and cut her left hand with a screwdriver. As Maria struggled with Ramos-Beleta over the knife and

2

screwdriver, she screamed for her children. Two of the children, R.R. and G.R., entered the room after G.R. had called 911. They asked Ramos-Beleta what he was doing; he responded that he was choking Maria because he loved her and that it was for her own good. At one point, R.R. tried to push Ramos-Beleta off of her mother as he continued to make stabbing motions towards Maria. When Ramos-Beleta saw the police lights flashing through the window, he told the children to turn off the bedroom lights and close the door. Instead, G.R. went outside to direct the officers inside the apartment.

Two police officers entered Maria's bedroom and observed the struggle. As one of the officers pulled Maria to the corner of the bed, Ramos-Beleta came towards Maria with the knife, attempting to stab her in the chest. The officer shot Ramos-Beleta twice. After being shot, Ramos-Beleta began yelling at Maria and appeared to bite her right leg. Maria and Ramos-Beleta were both transported to the hospital. Maria had injuries to her right leg, left shoulder, upper chest, hands, fingers, and abdomen. At the hospital, Ramos-Beleta told a nurse that he wanted to kill Maria and that she had ruined his life and the lives of the children.

Ramos-Beleta was charged with attempted first-degree murder, aggravated burglary, aggravated intimidation of a witness, two counts of criminal threat, intimidation of a witness, stalking, violation of a protective order, and child endangerment.

At trial, Ramos-Beleta testified as to his recollection of events on the day prior to the attack. He stated that he did not eat lunch or dinner that day and had started drinking beer around 4 or 5 p.m. He did not remember how much he had to drink. Ramos-Beleta denied that he ever intended to go to Maria's home or that he had angry thoughts about her while drinking that night. The last thing he remembered before waking up in the hospital was leaving a bar and "driving bad." Ramos-Beleta presented evidence that his blood-alcohol level was more than three times the legal limit at the time of his arrest.

The jury found Ramos-Beleta guilty as charged. The district court imposed a controlling prison sentence of 586 months.

A panel of this court upheld Ramos-Beleta's convictions for aggravated intimidation of a witness, intimidation of a witness, and endangering a child. However,

3

the panel reversed his conviction for attempted first-degree murder and remanded the case for a new trial. *Ramos-Beleta*, 2012 WL 5519119, at *5, 8. On March 28, 2013, the Kansas Supreme Court denied a petition for review filed by Ramos-Beleta.

On remand, the State and Ramos-Beleta reached a plea agreement. Pursuant to the agreement, the State agreed to reduce the attempted first-degree murder charge to attempted second-degree murder. In exchange, Ramos-Beleta agreed to plead no contest to the amended charges. Moreover, the parties agreed to recommend a sentence of 222 months of prison time to run consecutive to a 32-month sentence Ramos-Beleta had previously received for the convictions that this court affirmed on direct appeal.

The district court held a change of plea hearing on May 24, 2013. At the hearing, the district court provided Ramos-Beleta with a Spanish interpreter to assist him. In addition, the district court confirmed that Ramos-Beleta could read Spanish and provided him with a written "Arraignment or Entry of Plea" checklist in Spanish.

The State advised the district court of the terms of the plea agreement on the record, including the recommendation that Ramos-Beleta receive a sentence of 222 months on the attempted second-degree murder charge—to run consecutive to the 32-month sentence he had already received on the affirmed convictions. Moreover, the State made it clear that the total sentence would be "254 months with the Department of Corrections." In response, Ramos-Beleta's attorney stated, "[T]he State has correctly recited the terms of our agreement."

The district court then spoke directly to Ramos-Beleta, explaining the proposed agreement and advising him of the rights he would be giving up if he pleaded no contest to the amended charge. Furthermore, the district court explained the potential sentence and stated that it had "no objection to the issuance of a sentence of a total of 254 months." The district court also explained that because the Kansas Court of Appeals

4

affirmed several of the original charges on direct appeal, his sentence of 32 months for those convictions remained in place. The district court stated that the additional 222-month sentence on the amended charge would be added to the 32 months for a total sentence of 254 months in prison.

The district court then reviewed the written entry of plea checklist with Ramos-Beleta. The district court pointed out that the potential sentence that had just been discussed on the record was written on the front page of the document. The only additional information regarding the potential sentence that had not previously explained by the district court was the possibility of a fine up to $300,000. As such, the district court also pointed out that there was at least a possibility that a fine could be also be imposed.

The district court asked Ramos-Beleta if he had any questions and he responded that he did not. In addition, the district court confirmed that he had adequate time to consult with his attorney regarding the plea agreement. At that point, the State orally moved to amend Count One of the information from attempted first-degree murder to attempted second-degree murder. Ramos-Beleta did not object to the amendment and the district court granted the request. The parties and the district court agreed that probable cause for the amended charge had been established at the preliminary hearing and through the testimony presented at trial.

After Ramos-Beleta waived a formal reading of the amended information, the district court again asked him if he had any questions. He said that he did not. The district court also confirmed with Ramos-Beleta that he was a citizen of the United States and that his ability to stay in this country would not be affected by this case. Ramos-Beleta then entered a plea of no contest to the amended charge and the district court reviewed with him the meaning of a no contest plea. After Ramos-Beleta confirmed that he

5

understood the ramifications of his plea, the district court found him guilty of attempted second-degree murder.

On June 11, 2013, the district court held a sentencing hearing. Once again, the district court provided Ramos-Beleta with the assistance of a Spanish interpreter. The State advised the district court that it was recommending 222 months on the attempted second-degree murder conviction to run consecutive to a prior sentence of 32 months of prison time he was already serving, for a total of 254 months of imprisonment. The district court gave Ramos-Beleta the opportunity to make a statement, but he declined the opportunity to do so. Consistent with the terms of the plea agreement, the district court then sentenced Ramos-Beleta to 222 months of prison time on the attempted second-degree murder conviction—to run consecutive to the 32-month sentence he had previously received—for a total controlling sentence of 254 months. After announcing his sentence, the district court once again asked Ramos-Beleta twice if he had any questions, and he said he did not.

The Kansas Supreme Court subsequently summarily affirmed Ramos-Beleta's sentence. *State v. Ramos-Beleta*, No. 110,919 (Kan. order dated November 3, 2014) (unpublished). About a year later, Ramos-Beleta filed a 60-1507 motion alleging that his attorney had promised him that he would only have to serve 12 years in prison if he entered into the plea agreement. He further alleged that had he known he would receive 254 moths of prison time, he would not have entered into the plea agreement. As such, he asserted that his defense counsel was ineffective.

On April 29, 2016, the district court summarily denied Ramos-Beleta's 60-1507 motion. In doing so, the district court found that the parties had agreed to recommend a sentence of 222 months—to run consecutive to the 32-month sentence previously imposed—for a total sentence of 254 months. Moreover, the district court noted that the plea agreement was thoroughly reviewed with Ramos-Beleta before he entered his plea

6

and that the sentencing court adopted the recommendation made by the parties. As such, the district court concluded that Ramos-Beleta knew "beyond a shadow of a doubt" the terms of the plea agreement as well as the length of the potential sentence at the time he entered his no contest plea. Thus, the district court determined that the motion, record, and files conclusively showed that Ramos-Beleta was not entitled to relief.

ANALYSIS

On appeal, Ramos-Beleta contends that the district court erred in summarily denying his K.S.A. 60-1507 motion without an evidentiary hearing. A district court has three options when handling a K.S.A. 60-1507 motion:

> "(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing." [Citation omitted.]

*Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014).

When a district court summarily denies a K.S.A. 60-1507 motion, we conduct a de novo review to determine whether the motion, files, and records of the case conclusively establish that the movant is not entitled to relief. Moreover, the movant—in this case Ramos-Beleta—has the burden to establish that his or her motion warrants an evidentiary hearing. To meet this burden, "'the movant must make more than conclusory contentions and must state an evidentiary basis in support of the claims or an evidentiary basis must appear in the record.'" *Sola-Morales*, 300 Kan. at 881.

7

Judicial scrutiny of defense counsel's performance is highly deferential and requires consideration of all the evidence. We must presume that counsel's conduct fell within the broad range of reasonable professional judgment. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). Accordingly, in order to prevail on a claim of ineffective assistance of counsel, a defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) that this deficiency resulted in prejudice. *Sola-Morales*, 300 Kan. at 882 (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]). To establish prejudice, a defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

Here, Ramos-Beleta argues that his attorney promised that he would receive 12 years' incarceration as a result of the plea agreement entered into by the parties. He further argues that "it is entirely plausible that [he] thought he would be serving his sentences concurrently" because "when [he] was initially sentenced, all of his sentences were run concurrently." It should be noted that Ramos-Beleta's original sentence was 586 months—or approximately 49 years—of imprisonment. Ultimately, as a benefit of the plea agreement entered into by the parties and accepted by the district court, he received a sentence of 254 months—or approximately 21 years. Thus, the plea agreement resulted in a reduction of 332 months—or approximately 28 years—from his original sentence.

Nevertheless, we have reviewed the motion, files, and records in this case and we agree with the district court that they conclusively show that Ramos-Beleta is not entitled to relief. Indeed, we find that he voluntarily agreed to plead no contest to the reduced charge of attempted second-degree murder knowing that he could receive a total sentence of 254 months in prison. In particular, we find that the district judge who presided over the change of plea hearing meticulously explained to Ramos-Beleta his constitutional rights, the potential consequences of entering into a no contest plea to the amended

8

charge, and the potential—if not the likelihood—of a total sentence of 254 months of prison time if the plea was accepted. Additionally, the district court asked Ramos-Beleta if he had any questions, and he indicated that he did not have any.

Although it appears from the record that Ramos-Beleta was able to speak and understand at least some English, he advised the district court that his preferred language is Spanish. After confirming that Ramos-Beleta could read Spanish, the district court provided him with a written document containing information about the plea process in both English and Spanish. This document, which the district court reviewed with Ramos-Beleta, also indicated that the potential sentence was 222 months plus 32 months. After going over the document with Ramos-Beleta, the district court again asked him if he had any questions and he answered "No." Moreover, the district court asked Ramos-Beleta if he had sufficient time to consult with his attorney and he indicated that he did.

After Ramos-Beleta waived a formal reading of the amended information, the district court asked him yet again if he had any questions before he entered his plea. Once again, Ramos-Beleta said he did not have any questions. Finally, at the end of the hearing, the district court again asked Ramos-Beleta if he had any questions, and he said he did not. In addition, at the sentencing hearing, the district court explained the sentence to Ramos-Beleta and asked him if he had any questions. Yet again, he indicated that he did not have any questions.

Accordingly, we conclude that Ramos-Beleta has failed to assert sufficient facts that show that his defense attorney provided ineffective assistance of counsel. Likewise, we conclude that he has failed to demonstrate any prejudice. In light of the district court's thorough review of the terms of the plea agreement with Ramos-Beleta at the change of plea hearing, we do not find any reasonable probability that the outcome would have been any different but for defense counsel's performance. As the motion, files, and

records conclusively demonstrate Ramos-Beleta is not entitled to relief, we find that it was appropriate for the district court to summarily dismiss his 60-1507 motion.

Affirmed.